## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------- x
UNITED STATES OF AMERICA        :
                                :  Crim. No. 3:18-cr-155 (AWT)
           v.                   :
                                :
WILLIAM VALERIO-PALERMO and     :
ANDRES ACEVEDO-BALDERA          :
------------------------------- X
```

## <u>RULING ON MOTIONS TO SUPPRESS</u>

Defendants William Valerio-Palermo ("Valerio") and Andres Acevedo-Baldera ("Acevedo") are charged in a two-count amended indictment with conspiracy to possess with intent to distribute acetylfentanyl and fentanyl, in violation of 18 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846, and possession with intent to distribute 100 grams or more of acetylfentanyl, in violation of 18 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vi). Valerio moved to suppress all evidence obtained from the July 12, 2018 execution of a search warrant for 144 Oakwood Avenue, Apartment A4, West Hartford, Connecticut ("Apartment A4"), arguing that the warrant was secured using information obtained in violation of the Fourth Amendment. Acevedo separately filed a motion to suppress adopting the arguments and assertions made by Palermo.

For the reasons below, the motions are being denied.

## I.   FINDINGS OF FACT

On July 12, 2018, Drug Enforcement Administration ("DEA") Task Force Officer ("TFO") Jeffery Poulin applied for a search

warrant for Apartment A4. The facts to support the issuance of the search warrant were contained in an affidavit attached to the application. The affidavit detailed the identification and investigation of Valerio and Acevedo, and described their alleged narcotics distribution activities. A magistrate judge issued a search warrant for Apartment A4 on July 12, 2018 after finding that the affidavit submitted by TFO Poulin established probable cause to believe that items related to narcotics distribution would be found in that apartment. Investigators executed the search warrant later that day and seized several items from the apartment, including more than six kilograms of acetylfentanyl, assorted drug packaging and processing paraphernalia, and $49,000 in United States currency.

In the affidavit, TFO Poulin stated that, as of April 2018, he had received information from a DEA Confidential Source, designated as CS-1, that a person known to him or her as "Willy" was engaged in narcotics distribution in and around Hartford, Connecticut. TFO Poulin represented that previous information provided by CS-1 had been found to be accurate, true, and reliable. He summarized the information provided by CS-1 pertaining to the individual CS-1 knew as "Willy" and included the following details in the affidavit: "Willy" was involved in selling kilogram quantities of fentanyl in and around Hartford, Connecticut; he lived on Adams Street in East Hartford, Connecticut, where he kept

large amounts of currency derived from his narcotic sales; he owned an automotive shop located at 241 Ledyard Street, Hartford, Connecticut that he used largely as a front for his narcotics distribution; he received multiple kilograms of fentanyl on a monthly basis, which he would then sell to mid-level dealers in Hartford, Connecticut; he employed several people to assist with milling, transporting, and selling the narcotics; he used a gray Honda Accord, bearing Pennsylvania registration K45427K, a black Honda Accord, bearing Texas registration 995324C, and a white Dodge Ram truck to transport narcotics and related proceeds in hidden compartments of the vehicles; and he used two telephones, (860) 706-6209 (referenced in the affidavit as "Target Telephone 1") and (860) 610-9935 (referenced in the affidavit as "Target Telephone 2"), to arrange in-person meetings to conduct drug transactions.

With this information, TFO Poulin and other DEA investigators identified "Willy" as Valerio. According to Connecticut Department of Motor Vehicle records, Valerio resided at 35 Adams Street in East Hartford, Connecticut. State of Connecticut business records showed that Valerio was part owner of an auto shop, Tikal Unlimited Auto LLC, located at 241 Ledyard Street, Suite B7, Hartford, Connecticut. Law enforcement officers showed a photograph of Valerio to CS-1, who identified the man in the photograph as the individual he or she knew as "Willy."

The affidavit also recited information obtained on May 11, 2018 by TFO Poulin from Homeland Security Investigations TFO Zach Kashmanian. TFO Kashmanian stated that Valerio had been stopped by Customs and Border Patrol ("CBP") on April 5, 2018 at Newark International Airport while attempting to leave the United States with John Hidalgo-Collado and Acevedo. CBP reported that each individual was carrying approximately $9,500 in United States currency similarly bundled with rubber bands. CBP did not seize the money or make an arrest. TFO Poulin subsequently obtained a New Jersey driver's license for Acevedo, which was later shown to CS-1. CS-1 identified Acevedo as the "right-hand man" and a close criminal associate of Valerio who was responsible for stashing quantities of narcotics for later distribution.

The affidavit also detailed court authorizations for the use of pen registers and traps and traces, the disclosure of telecommunications records, and the disclosure of E-911 precision location information for Target Telephone 1 and Target Telephone 2. On June 1, 2018, at approximately 10:05 a.m., precision location data placed Target Telephone 1 in the vicinity of Oakwood Avenue and Seymour Avenue, West Hartford, Connecticut and investigators responded to the area to locate Valerio. At approximately 11:44 a.m., an investigator observed Valerio and another unidentified male exit the rear door at 144 Oakwood Avenue, a multi-unit apartment complex, and approach a white Dodge Ram parked in the

-4-

rear of the building. The investigator partially read the Dodge Ram's license plate as "K45427," which was a match to a license plate that CS-1 had reported was used by Valerio.

On June 7, 2018, phone calls between Jimmy Flores, a mid-level narcotics trafficker in Hartford, Connecticut, and Target Telephone 1 were intercepted by law enforcement officers. The participants discussed narcotics using coded language. At approximately 6:52 p.m., Flores' telephone, the subject of a separate wiretap order, was in the area of the auto shop.

On June 14, 2018, the FBI intercepted communications between Flores and a phone number, (860) 770-7043, that investigators later identified as being used by Acevedo. The intercepted conversations were understood by investigators to mean that a sale of narcotics had been arranged between Flores and Acevedo for the next day. On June 15, 2018, at approximately 8:30 a.m., TFO Poulin observed a gray Honda Accord arrive at the parking lot of 144 Oakwood Avenue, after which Valerio entered the rear door of the apartment building. At approximately 8:56 a.m., TFO Poulin observed Valerio exit the building carrying a small white grocery bag that appeared weighted down. TFO Poulin then observed Acevedo exit the apartment building and join Valerio in the gray Honda Accord. The investigators subsequently stopped the vehicle and obtained Valerio's consent to search it. The search revealed no evidence of contraband, and Valerio and Acevedo departed. Shortly thereafter,

Target Telephone 1 was located in the area of 241 Ledyard Street. At approximately 10:03 a.m., the FBI intercepted a call to Flores from (860) 770-7043. At approximately 11:03 a.m., Flores was followed by surveillance units to 241 Ledyard Street. He was observed leaving 241 Ledyard Street 35 minutes later. At approximately 11:40 a.m., a marked police car pulled in behind Flores' car. Moments later, the FBI intercepted a call Flores made to his brother, during which Flores said, inter alia, "the narcs about to rush me, bro. . . . I'm dirty as hell, bro." The marked unit then pulled away.

Based on the foregoing, investigators believed that a narcotics transaction had been arranged between Flores and Acevedo and the sale had been made at the auto shop. Sometime thereafter, CS-1 reported to investigators that Valerio told CS-1 that he had recently been stopped in the gray Honda Accord, that the vehicle had been searched by police, that, at the time of the search, he had large quantities of narcotics and cash in the vehicle's secret compartment and the police did not find them.

The affidavit also contained information obtained by investigators about 144 Oakwood Avenue. On June 1, 2018, a search of a law enforcement database for records associated with 144 Oakwood Avenue revealed that in March 2018, Apartment C4 was listed by T-Mobile as the service address for a cell phone account in the name of "Andres Acevedo." One database showed that "Andres Acevedo"

was associated with Apartment C4 from October 6, 2017 through April 23, 2018, and another database showed that he was associated with it from March 17 through 19, 2018. A review of location data regarding Target Telephone 1 and Target Telephone 2 revealed that both phones had frequently been in the area of 144 Oakwood Avenue. Investigators had observed Valerio and Acevedo at 144 Oakwood Avenue on multiple occasions.

The affidavit also stated that investigators, with the assistance of CS-1, conducted a controlled buy of fentanyl from Valerio and Acevedo during the last week in June 2018. Before the transaction, CS-1 was outfitted with audio and video recording and transmitting equipment and investigators had surveillance units at the auto shop and at 144 Oakwood Avenue. CS-1 then met Acevedo and Valerio at the auto shop to purchase fentanyl. After negotiating a price, Valerio told CS-1 that he had to get the fentanyl from another location and that he had to make an unrelated stop on the way. Consistent with his statements to CS-1, Valerio was observed leaving the auto shop with Acevedo in the gray Honda Accord, stopping at an apartment complex in the South End of Hartford for a brief time, driving to 144 Oakwood Avenue, and entering the apartment building. Sometime later, Valerio and Acevedo were observed reentering the vehicle, and Valerio was seen manipulating something in the center console. Valerio and Acevedo then drove back to the auto shop, where they delivered the suspected fentanyl

to CS-1. A DEA laboratory later confirmed that the drugs were fentanyl.

On July 11, 2018, a magistrate judge issued search warrants for 35 Adams Street, the auto shop, the gray Honda Accord, and Apartment C4. Investigators executed these warrants on July 12, 2018. At approximately 8:00 a.m. that day, investigators observed Acevedo leave 144 Oakwood Avenue, enter the parked gray Honda Accord, and drive away. Investigators then initiated a traffic stop to execute the search warrant for the vehicle. After being given his Miranda warnings, Acevedo told investigators that he lived in Apartment C4 with his friend, Allan Gonzalez, Allan's wife, who is named Wendy Gill, and their minor daughter. Investigators took some keys from the center console of the Honda and asked which key opened Apartment C4. Acevedo identified the key to the exterior door to 144 Oakwood Avenue but said he did not have a key to Apartment C4. When questioned about how he was able to access Apartment C4 without a key, Acevedo provided no answer.

Meanwhile, investigators executed the search warrant for Apartment C4, which was occupied by Gonzalez, Gill, and their minor daughter. Both Gonzalez and Gill denied knowing Acevedo and denied that anyone else lived in the apartment with them. Gill asked investigators if they had checked the other apartments in the building for Acevedo. Ultimately, no evidence relevant to the alleged drug distribution activities of the defendants was found

in Apartment C4. TFO Poulin stated in the affidavit that this absence of evidence led investigators to believe that there was another apartment in the building that was being used by Valerio and Acevedo for narcotics distribution.

As set forth in paragraph 75 of the affidavit, investigators subsequently interviewed the owner of 144 Oakwood Avenue and the building superintendent. They told investigators that a person named "Willy" was renting Apartment C4 when Apartment A4 became available in May 2018. "Willy" asked if he could rent Apartment A4 for his cousin or nephew. Thereafter, "Willy" was renting both apartments. Rent was initially paid by check from a "Willy Teller," but subsequently was paid in cash by either "Willy" or his cousin or nephew. When shown photographs of Valerio and Acevedo, the superintendent identified them as "Willy" and as the cousin or nephew, respectively.

Paragraphs 72, 73, 74 and 76 of the affidavit included some additional facts that are not being considered by the court in its analysis of whether the search warrant issued on July 12, 2018 for Apartment A4 was supported by probable cause.

As set forth in paragraph 72 of the affidavit, on July 12, 2018, investigators inserted one of the keys taken from Acevedo during the execution of the search warrant for the grey Honda Accord into the door to Apartment A4. After discovering that the key opened the door to Apartment A4, the investigators knocked but

received no answer. TFO Poulin stated in the affidavit that they then entered the apartment to ensure that there was no one inside destroying or removing evidence. Upon entry, the investigators detected a strong chemical smell, consistent with the presence of controlled substances. They conducted a protective sweep, during which they observed drug packaging and processing paraphernalia. As set forth in paragraph 73 of the affidavit, the investigators then withdrew from and secured the apartment until they had applied for and obtained the search warrant that is at issue in these motions.

As set forth in paragraph 74 of the affidavit, the investigators subsequently spoke with the tenant who lived in the apartment directly across from Apartment A4. The tenant stated that two men moved into Apartment A4 sometime in May 2018.

As set forth in paragraph 76 of the affidavit, the investigators subsequently questioned Acevedo about Apartment A4. TFO Poulin stated in the affidavit that Acevedo appeared to be on the verge of tears when questioned but suggested that the keys retrieved from the Honda did not belong to him.

## II.  DISCUSSION

The defendants move to suppress all evidence obtained from Apartment A4. They argue that the investigators' insertion of a key into the door to Apartment A4 and their initial entry into Apartment A4 each constituted a warrantless, unconstitutional

search and that the magistrate judge's finding of probable cause was based on evidence acquired as a result of these unlawful searches. The government contends that suppression is unwarranted because, irrespective of the alleged illegality of the challenged conduct, the investigators acted reasonably and in good faith reliance on a facially valid search warrant. The government also argues that the investigators' insertion of the key into the door to and initial entry into Apartment A4 constituted reasonable searches that were justified by the existence of exigent circumstances. Finally, the government contends that the search warrant was supported by probable cause even if the information obtained as a result of the challenged conduct is excised from the affidavit.

The court does not need to resolve the issue of whether the insertion of the key into the door to and the initial entry into Apartment A4 constituted Fourth Amendment violations because there was untainted evidence sufficient to support the search warrant without considering the information obtained as a result of the challenged conduct. Moreover, the investigators acted in good faith reliance on a facially valid search warrant.

## A. Sufficient Untainted Evidence

Probable cause is a "practical, commonsense decision [that], given all the circumstances set forth in the affidavit . . ., including the 'veracity' and 'basis of knowledge' of persons

supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Martin, 426 F.3d 68, 74 (2d Cir. 2005) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). The inquiry of whether probable cause exists turns on an "assessment of probabilities in particular factual contexts . . . and inferences, not on proof of specific criminal conduct beyond a reasonable doubt or even by a preponderance of the evidence." Id. at 76. Because probable cause is a "flexible, common-sense standard," Gates, 462 U.S. at 239, an affidavit need only provide the magistrate with a "substantial basis for determining [its] existence." Id.

"[A]lthough unlawfully obtained evidence should not be included in an affidavit, it is well established that 'the mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant.'" United States v. Peeples, 962 F.3d 677, 688 (2d Cir. 2020) (quoting United States v. Trzaska, 111 F.3d 1019, 1026 (2d Cir. 1997)). When faced with these circumstances, "[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." Trzaska, 111 F.3d at 1026. "The ultimate inquiry is whether . . . there remains a residue of independent and lawful information sufficient to support probable cause." United States v. Canfield, 212 F.3d 713, 718 (2d Cir.

2000). If so, the warrant was properly issued, and the evidence obtained by its execution will not be suppressed. See id. at 719; see also United States v. Thomas, 757 F.2d 1359, 1367 (2d Cir. 1985) ("To have the evidence seized pursuant to the search warrant suppressed, [the defendant] must . . . show that there was not a sufficient residue of probable cause to support the warrant, without considering the [unlawfully obtained evidence] . . .").

In deciding whether there was evidence sufficient to support the search warrant for purposes of these motions, the court assumes, arguendo, that the insertion of the key into the door to and the initial entry into Apartment A4 were unlawful. Accordingly, the court does not consider the evidence set forth in paragraphs 72, 73, 74, and 76 of the affidavit. However, paragraph 75 should not be excised. Several details in the affidavit make it reasonable to conclude that the investigators would have interviewed the owner and the superintendent of the building about the tenants in the apartment building even in the absence of the challenged conduct. The investigators had precision location and surveillance data placing Valerio and Acevedo at 144 Oakwood Avenue in connection with anticipated drug transactions and a controlled purchase of fentanyl. Through law enforcement database records, the investigators knew that Acevedo was associated with Apartment C4 at 144 Oakland Avenue in March and April 2018. During the execution of the search warrant for the gray Honda Accord, Acevedo told

investigators that he lived in Apartment C4 at 144 Oakwood Avenue with Gonzalez, Gill and their minor daughter. But he conceded that, while he had a key to the exterior door of 144 Oakwood Avenue, he did not have a key to Apartment C4 and had no response when asked by investigators how he got into Apartment C4 without a key. During the execution of the search warrant for Apartment C4, Gonzalez and Gill denied that Acevedo lived in the apartment with them and Gill asked the investigators if they had checked the other apartments in the building. Finally, investigators found no evidence of Valerio and Acevedo's alleged drug distribution activities in Apartment C4.

Excluding information that was the product of the insertion of the key into the door to and the initial entry into Apartment A4, the affidavit before the magistrate judge still included the information in the preceding paragraph and the following additional facts: An individual named "Willy" was renting Apartment C4 when Apartment A4 became available in May 2018. "Willy" asked the owner or the building superintendent if he could rent Apartment A4 for his cousin or nephew. Thereafter, "Willy" rented both apartments. The investigators showed the building superintendent photographs of Valerio and Acevedo, who he identified as the men he knew as "Willy" and his cousin or nephew, respectively.

The evidence that supported the issuance on July 11, 2018 of the search warrants for 35 Adams Street, the auto shop, the gray Honda and Apartment C4, together with (i) the statements and conduct of Acevedo on July 12, 2018 and the information obtained when the search warrant for Apartment C4 was executed, and (ii) the information obtained from the owner of 144 Oakwood Avenue and the building superintendent about "Willy" initially renting Apartment C4 and then both Apartment C4 and Apartment A4, and the identification of the photographs of Valerio and Acevedo, were a substantial basis for a neutral magistrate to conclude that there was a fair probability that evidence related to narcotics distribution by Valerio and Palermo would be found in Apartment A4.

Therefore, the court finds that the warrant affidavit, excised of evidence obtained as the result of the challenged conduct, contains sufficient untainted evidence to constitute probable cause supporting the search warrant for Apartment A4.

## B. Good-Faith Reliance

Assuming arguendo that the insertion of a key into the door to and the initial entry into Apartment A4 constituted Fourth Amendment violations, the court also finds that the "good faith" exception to the exclusionary rule applies in this case.

"[E]vidence obtained by officers in objectively reasonable reliance on a warrant subsequently invalidated by a reviewing court

is not generally subject to exclusion." United States v. Raymonda, 780 F.3d 105, 118 (2d Cir. 2015) (internal quotation marks and citation omitted). "When an officer genuinely believes that he has obtained a valid warrant from a magistrate and executes the warrant in good faith, there is no conscious violation of the Fourth Amendment, and 'thus nothing to deter'" by suppression. Id. (quoting United States v. Leon, 568 U.S. 897, 921 (1984)). However, the officer's reliance on the warrant "must be objectively reasonable." Leon, 568 U.S. at 922. The "inquiry is confined to the objectively ascertainable question [of] whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization. . . . [in light of] all the circumstances." Id. at 922 n.23. "The essential rationale underlying the good faith exception is that the exclusionary rule 'cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.'" United States v. Cancelmo, 64 F.3d 804, 807 (2d Cir. 1995) (quoting Leon, 468 U.S. at 919).

The good faith exception is inapplicable where law enforcement officers "fail to provide all potentially adverse information to the issuing judge" and thus omit information critical to the determination of whether a warrant should issue. United States v. Reilly, 76 F.3d 1271, 1280 (2d Cir. 1996) (good faith exception inapplicable where officers failed to disclose

their conduct during pre-warrant searches to the issuing judge).

In Reilly, officers illegally intruded on the defendant's

curtilage, discovered a clearing with about 20 marijuana plants,

and subsequently obtained a search warrant based on a "bare-bones

description" of their intrusion, which the court found "almost

calculated to mislead." Id. The court stated:

> "Good faith is not a magic lamp for police officers to
> rub whenever they find themselves in trouble. For the
> good faith exception to apply, the police must
> reasonably believe that the warrant was based on a valid
> application of the law to the known facts. In the instant
> matter, the officers failed to give these facts to the
> magistrate.
>
> . . .
>
> The officers went to [the issuing judge] with the fruit
> of this prior search in hand, and it was on the basis of
> that evidence that they asked him to issue a warrant.
> Yet the officers never gave [the issuing judge] a full
> account of what they did. Without such an account, [the
> issuing judge] could not possibly decide whether their
> conduct was sufficiently illegal and in bad faith as to
> preclude a valid warrant. This fact, by itself, makes
> Leon [and its recognition of the good faith exception]
> inapplicable.

Id. Conversely, the good faith exception is applicable where

officers disclose all potentially adverse facts to the issuing

judge. See United States v. Ganias, 824 F.3d 199, 221 (2d Cir.

2016) (finding good faith reliance on search warrant where officers

allegedly committed a constitutional violation and apprised the

issuing judge of the facts of the conduct at issue in the affidavit

supporting their warrant application); United States v. Thomas,

757 F.2d 1359, 1368 (2d Cir. 1985) (finding good faith reliance on search warrant where officers engaged in conduct they did not reasonably know, at the time, was unconstitutional -- a warrantless canine sniff -- and fully disclosed the canine sniff to the issuing judge).

In Thomas, the defendant moved to suppress the evidence found while executing a search warrant, arguing that the antecedent canine sniff was an unconstitutional search and that, without the evidence obtained from the sniff, the affidavit to support the warrant lacked probable cause. The court agreed on both counts. It nevertheless concluded that suppression was inappropriate because the agent's reliance on the warrant was in good faith:

> [The] agent brought his evidence, including the positive alert from the canine, to a neutral and detached magistrate. That magistrate determined that probable cause to search existed, and issued a search warrant. There is nothing more the officer could have or should have done under these circumstances to be sure his search would be legal. The magistrate, whose duty it is to interpret the law, determined that the canine sniff could form the basis for probable cause; it was reasonable for the officer to rely on this determination.

Id. In distinguishing Thomas, the court in Reilly stressed that the agent in Thomas "did not have any significant reason to believe that what he had done was unconstitutional" and "presented the canine sniff evidence to the magistrate," Reilly, 76 F.3d at 1281, whereas the officers in Reilly "undertook a search that caused them to invade what they could not fail to have known was

potentially . . . curtilage" and "then failed to provide [the issuing judge] with an account of what they did." Id.

Here, as in Thomas, TFO Poulin included all potentially adverse information in the affidavit, apprising the issuing magistrate judge of the facts pertaining to insertion of the key into the door to and the initial entry into Apartment A4. Having fully disclosed the challenged conduct, "there is nothing more the [investigators] could have . . . done under these circumstances to be sure [their] search would be legal." Thomas, 757 F.2d at 136; see also Leon, 468 U.S. 922 ("It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause. . . . [and] an officer cannot be expected to question [that] determination. . . . Once the warrant issues, there is . . . nothing more the policeman can do in seeking to comply with the law." (internal quotation marks and citations omitted)). Moreover, as in Thomas, the investigators here "did not have any significant reason to believe that what [they] had done was unconstitutional." Reilly, 76 F.3d at 1281. At the time that the challenged conduct occurred, no court in the Second Circuit had concluded that the insertion of a key into a door constituted a search under the Fourth Amendment.[1]

---

[1] Courts in other jurisdictions have addressed whether the insertion of a key into a lock constitutes a search under the Fourth Amendment. See United States v. Bain, 874 F.3d 1 (1st Cir. 2017) (concluding that the insertion and turning of a key into an apartment door lock constitutes a search under the Fourth Amendment that requires probable cause and a

Therefore, in light of all the circumstances here, the court concludes that the good faith exception applies and that suppression of the evidence obtained in Apartment A4 is inappropriate.

### III. CONCLUSION

For the reasons set forth above, Defendant William Valerio-Palermo's Motion to Suppress Evidence (ECF No. 49) and Defendant Andres Acevedo-Baldera's Motion to Suppress Evidence (ECF No. 60) are hereby DENIED.

It is so ordered.

---

warrant to support it); United States v. Conception, 942 F.2d 1170 (7th Cir. 1991) (concluding that the insertion of a key into an apartment door lock to see if it fits is a search that does not require probable cause to support it because the privacy interest in the lock's keyhole is minimal); United States v. Lyon, 898 F.2d 210 (1st Cir. 1990) (concluding that the insertion of a key into a storage compartment padlock solely for the purposes of identifying ownership is not a search because the defendant did not have an expectation of privacy in the padlock); United States v. DeBardeleben, 740 F.2d 440 (6th Cir. 1984) (concluding that the insertion of a key into a vehicle door for the purposes of identifying ownership was a minimal intrusion that did not constitute a search); United States v. Portillo-Reyes, 529 F.2d 844 (9th Cir. 1975) (concluding that the insertion of a key into a vehicle door constitutes the beginning of a search that requires probable cause to support it); Commonwealth v. Alvarez, 661 Mass. 198 (1996) (concluding that the insertion of a key into an apartment door lock to see if it fits is a search that does not require probable cause to support it because the privacy interest involved is minimal); People v. Carroll, 12 Ill.App.3d 869 (1973) (concluding that the insertion of a key into an apartment door lock solely for the purposes of identifying ownership is not a search but suggesting that a subsequent entry and search of the apartment after the insertion of a key "[c]ertainly . . . would have been a different case[.]").

Dated this 8th day of September 2020, at Hartford,

Connecticut.

                                    /s/ AWT
                              Alvin W. Thompson
                         United States District Judge